IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**KIM ENRIQUEZ,**                                     Civil Case No. 09-724-HU

      Plaintiff,

    v.                                                              **OPINION AND ORDER**

**DAVID DOUGLAS SCHOOL
DISTRICT, SUSAN SUMMERS,
JODY TAYLOR,**

      Defendants.

Mark Morrell
1200 Jackson Tower
806 S.W. Broadway
Portland, Oregon 97205
    Attorney for plaintiff


Steven A. Kraemer
Gregory R. Roberson
Hoffman, Hart & Wagner
1000 S.W. Broadway, 20th Floor
Portland, Oregon 97205
    Attorneys for defendants

HUBEL, Magistrate Judge:

    This is an action for deprivation of civil rights under 42

U.S.C. § 1983, false arrest, wrongful discharge and unpaid wages

brought by Kim Enriquez, a former employee of David Douglas School

OPINION AND ORDER Page 1

District (District) against the District and two of its supervisory employees, Susan Summers[1] and Jody Taylor. The action was removed to this court from Multnomah County. The parties have consented to my entering a final judgment.

### Factual Background

Enriquez worked as head cook at the District's Gilbert Park Elementary School from October 30, 1996 to April 3, 2008. First Amended Complaint (Complaint) ¶ 1. Defendant Susan Summers was Director of Human Resources for the District. Defendant Jody Taylor supervises all nutrition services employees, including Enriquez. Id. at ¶ 2. See also Taylor Declaration ¶ 2.

The District operated a computer software program called MealTime as part of its school lunch programs. Taylor Declaration ¶ 3. MealTime kept track of student "accounts," in which lunch money was credited. Families could move money between their children's accounts by notifying the school if one of the accounts ran short. Complaint ¶ 3. MealTime recorded the date and time a transaction was made, the identification of the computer from which the entry was made, and the type of transaction (e.g., deposit, void, add adjust, subtract adjust). Taylor Declaration ¶¶ 3, 6, 7. Add adjust and subtract adjust transactions were used to transfer money between accounts. Id.

---

[1] According to the Declaration of Michael Stout, Deputy Superintendent for the District, Summers died on September 7, 2009. Stout Declaration ¶ 4.

OPINION AND ORDER Page 2

Enriquez, along with other kitchen staff and district employees, would from time to time make MealTime entries on computer terminals, recording receipt or transfers of money to the various student accounts. Complaint ¶ 4. As part of her job, Enriquez counted the cash and checks to be deposited into a District bank account each day and ensured that the deposit matched the total amount deposited through MealTime. Taylor Declaration ¶ 5; Enriquez dep. 79:22-80:11. Other cafeteria employees also received cash and checks from account holders to be deposited into MealTime Accounts. Enriquez dep. 79:16-80:10; 84:2-19. There are nearly a dozen computer terminals, some off-site from the school, that have access to the student lunch money accounts. Complaint ¶ 4.

On February 25, 2008, Taylor discovered an unusually high number of add adjust transactions for that month at Gilbert Park, relative to other schools in the district. Taylor Declaration ¶ 9. Taylor spoke to Stout about it. Stout Declaration ¶ 5. Eventually, Taylor discovered 139 add adjust transactions, with only 10 corresponding subtract adjust transactions. Taylor Declaration ¶¶ 9, 12, 17, Exhibit E, p. 1-6.

On February 26, 2008, Taylor called Enriquez to obtain the names of all persons with access to the cafeteria office computer and to the cash deposits. Id. at ¶ 11. Taylor compared the dates for suspicious add adjust transactions with employee timesheets

OPINION AND ORDER Page 3

showing absences from work. Id. Taylor's comparison indicated that only Enriquez worked on each day a suspicious add adjust transaction occurred, and that no suspicious add adjust transactions occurred when Enriquez was absent from work. Id. at ¶¶ 11, 17, Exhibit E. Taylor informed Stout of her findings, who in turn informed District Superintendent Barbara Rommel. Stout asked District employee Shawn Sutliff, a computer technician, to assist in analyzing the MealTime transaction reports. Stout Declaration ¶ 5. Stout also called Portland Police Officer Steven Morinville. Id. Taylor went to Gilbert Park to speak to individual employees, including Enriquez, about how cash was handled, and to gather copies of the daily paperwork. Id. at ¶ 12. Taylor states in her declaration that she never forced Enriquez to speak with her, and that Enriquez never told Taylor she did not want to speak to her. Id. at ¶ 13.

Taylor, Sutliff and Morinville attended a meeting with Stout on February 26, 2008. Taylor Declaration ¶ 13; Morinville Declaration ¶ 2. Sutliff and Taylor explained how the MealTime accounting worked and how the transactions reports showed cash being taken and add adjust transactions made to cover it up. Taylor Declaration ¶ 13. Taylor explained the results of her timesheet comparisons for the people with access to the cafeteria office computer and the cash deposits, with her conclusion that only Enriquez was working each time a suspicious transaction occurred,

OPINION AND ORDER Page 4

with no suspicious transactions during a two week period in January when Enriquez was away from work. Id. Taylor states in her declaration that she did not tell Morinville to arrest Enriquez. Id.

Morinville looked at the transactions and employee records showing dates worked and, on the basis of this evidence, officers Morinville and Delton Stroh concluded there was probable cause to arrest Enriquez. Stroh Declaration ¶¶ 3-5; Morinville Declaration ¶¶ 4, 6-7. On March 4, 2008, the two officers interviewed Enriquez at Gilbert Park School. Stroh Declaration ¶ 4; Morinville Declaration ¶ 6. No District officials were present during the interview. Id. Enriquez did not admit to the thefts, but her explanations for why she could not have done them did not persuade the officers. Id. Officer Stroh arrested Enriquez. Id. According to Morinville and Stroh, no District official pressured or instructed them to arrest Enriquez. Stroh Declaration ¶ 5; Morinville Declaration ¶ 7. Enriquez was escorted out of the school, handcuffed, and taken to jail. Complaint ¶ 5.

When Enriquez was released from jail later that evening, Summers called her about coming to the school the next day to speak with her about the District's investigation of the thefts. Enriquez dep. 130:18-21. Enriquez subsequently talked to her husband, who had in the meantime talked to Enriquez's lawyer. Id. at 130:20-22. Enriquez called Summers the next morning and told Summers she

OPINION AND ORDER Page 5

wanted to "set up a different meeting" because her lawyer, David Peters, wanted to be there. Id. at 131:2-6. According to Enriquez, Summers wanted to know why Enriquez had hired a lawyer, and began yelling at Enriquez about why she had hired a lawyer when Summers had not even started her investigation. Id. at 131:6-11.

On March 5, 2008, Summers sent Enriquez a letter suspending her with pay, as of that date, "in order for me to conduct an investigation into your arrest on March 4, 2008, for Theft I." Morrell Declaration, Exhibit 3; Kraemer Declaration, Exhibit A. According to Stout, the decision to suspend Enriquez with pay after her arrest and pending further investigation was made by Summers, and was in accordance with Article 17 of the collective bargaining agreement (CBA). Stout Declaration ¶ 13.

Peters has testified that he talked to Summers on March 11, 2008, and formed the opinion that Summers had already "done her investigation, knew what had happened, that's why my client got arrested, and nothing we did was going to change it." Peters dep. 44:14-17. Peters concluded that a meeting with Summers would not be helpful to Enriquez. Id. at 44:14-17; 47:5-16. Enriquez declined to meet with Summers. Complaint ¶¶ 6, 7.

On April 3, 2008, the District terminated Enriquez. The decision to terminate Enriquez was made by Summers and Superintendent Rommel. Stout Declaration ¶ 14. On April 3, 2008, Enriquez received a termination letter signed by Rommel. Morrell

Declaration, Exhibit 4; Kraemer Declaration Exhibit B. The letter states that Summers

> asked to meet with you, with representation, on March 5, 2008 ... to answer questions related to the investigation. On March 5, you contacted Mrs. Summers and told her you had been instructed by your attorney not to attend the meeting. When Mrs. Summers contacted your attorney, David Peters, he stated that you would not be responding to any questions as part of the district's investigation.

Id. Rommel outlined the findings of the investigation, to the effect that Enriquez was present at the times most of the questionable add adjustments were made, and that such adjustments were not made when she was absent. Id. Rommel concluded, "We have been denied the opportunity to speak with you, Kim, and have no record of information that implies another explanation for the misappropriated funds." Therefore, "based on the information above," she was terminated effective April 3, 2008. Id.

The District asserts that at no time from February 25, 2008, to April 3, 2008, when Enriquez was terminated, did any District employee require Enriquez to answer questions related to the theft, subpoena Enriquez or otherwise ask her to make statements under penalty of perjury, or sign a waiver of her constitutional right against self-incrimination. Stout Declaration ¶ 15.

The District's representatives testified at Enriquez's unemployment hearing that the District had terminated her because she declined to cooperate in the investigation relating to the theft charges. Id. at ¶ 11.

OPINION AND ORDER Page 7

On September 19, 2008, Enriquez was acquitted of all charges brought against her after a three day jury trial. Id. at ¶ 13.

Enriquez asserts four claims for relief: 1) common law wrongful discharge, asserted against the District only, based on termination for pursuing her rights against self-incrimination and her right to effective counsel; 2) false arrest, asserted against the District only; 3) a claim under 42 U.S.C. § 1983 claim against Summers and Taylor only, based on deprivation of her rights against self-incrimination and to effective counsel; and 4) unpaid wages, based on the District's failure to pay Enriquez for two days, September 17, 2007 and November 2, 2007; failure to provide her with lunch breaks for over two years before her termination; and failure to pay wages due for the last two days of her employment.

On her first and second claims, Enriquez seeks lost wages (approximately $40,000), future lost wages up to retirement at age 60 ($448,000), loss of retirement benefits (estimated at $600,000), and emotional distress damages in the amount of $500,000. On her fourth claim, Enriquez seeks economic damages of $3,500 plus a statutory penalty in the amount of $3,948, with interest until paid. She seeks punitive damages on her third claim.

Defendants move for summary judgment on all four claims for relief. As an alternative to summary judgment on the § 1983 claim, defendants move for partial summary judgment on Enriquez's entitlement to punitive damages. As an alternative to summary

OPINION AND ORDER Page 8

judgment on the wage claim, defendants move for summary judgment on Enriquez's allegation that the District altered Enriquez's timesheets.

## Discussion

Defendants move against Enriquez's § 1983 claim, based on violation of her rights against self-incrimination and to the assistance of counsel, on the ground that Summers and Taylor did not violate Enriquez's clearly established constitutional rights, because 1) the District never compelled Enriquez to make statements to be used in a criminal proceeding; 2) Enriquez was never asked to waive her right against self-incrimination; and 3) Enriquez did not have a constitutional right to counsel during the District's investigation into the thefts.

1.   The § 1983 claim-self incrimination

The right against self-incrimination under the Fifth Amendment is applicable to states and its instrumentalities through the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1 (1964). Although Enriquez twice cites the Oregon Constitution as a source of rights under 42 U.S.C. § 1983 (Complaint ¶¶ 15, 20, 21), only violations of the federal constitution or federal law are cognizable under 42 U.S.C. § 1983. Canell v. Oregon Dept. of Justice, 811 F. Supp. 546, 550 (D. Or. 1983).

The constitutional guarantee against compelled self-incrimination "privileges a person not to answer official questions

OPINION AND ORDER Page 9

in any ... proceeding, civil or criminal, formal or informal, where he or she reasonably believes the answers might incriminate him or her in a criminal case." <u>Lefkowitz v. Turley</u>, 414 U.S. 70, 77 (1973).

Defendants assert that Enriquez's right against self-incrimination was not violated, relying primarily on <u>Gardner v. Broderick</u>, 392 U.S. 273, 274-75 (1968). In <u>Gardner</u>, the Court held that a police officer's Fifth Amendment rights were violated after he was discharged for refusing to sign a waiver of immunity upon appearing before a grand jury.[2] But the Court also held that public employees *may* be discharged for not answering questions in relation to their duties *if* they are not required to waive immunity:

> If appellant ... *had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself* ... the privilege against self-incrimination *would not have been a bar to his dismissal.*

---

[2] There is a line of cases to the effect that an individual cannot be threatened with the loss of his job or with serious economic consequences for refusal to sign a waiver of his right against self-incrimination. In addition to <u>Gardner</u>, see <u>Lefkowitz v. Turley</u>, 414 U.S. 70, (1973)(waiver sought from architect under threat of loss of contracts); <u>Garrity v. New Jersey</u>, 385 U.S. 493, 494-96 (1997)(violation of constitutional right against self-incrimination to tell police officers under subpoena for allegedly fixing traffic tickets that they would be terminated if they invoked their right against self-incrimination); <u>Aguilera v. Baca</u>, 510 F.3d 1161, 1171 (9th Cir. 2007)(Supreme Court has made it clear that public employees cannot be compelled to choose between providing unprotected incriminating testimony or losing their jobs).

Id. at 278 (emphasis added). See also Lefkowitz v. Cunningham, 431
U.S. 801, 806 (1977) ("Public employees may constitutionally be
discharged for refusing to answer potentially incriminating
questions concerning their official duties if they have not been
required to surrender their constitutional immunity."); Aquilera,
510 F.3d at 1171[3] (Supreme Court has been "careful ... to preserve
the right of a public employer to appropriately question an
employee about matters relating to the employee's possible conduct
while on duty"). In Aquilera, the court quoted with approval from
Hill v. Johnson, 160 F.3d 469, 471 (8th Cir. 1998): "The Fifth
Amendment is violated only by the combined risks of both compelling
the employee to answer incriminating questions and compelling the
employee to waive immunity from the use of the answers." The

---

[3] Aquilera was a case in which police officers were waiting
to be interviewed about a citizen complaint about an unprovoked
assault when their commanding officer came in and "announced, in
a harsh, accusatory manner," that one of them had committed the
assault, that the others were covering up, and that one or more
of them could be criminally prosecuted or fired for doing so."
Id. at 1165-66. Hours later, the officers were asked for written
statements; under advice of counsel, they refused. Id. at 1166.
None of the officers was asked to waive any right not to have the
statement used against him in a later criminal proceeding, and no
officer gave either a compelled or voluntary statement. Id. After
the investigation was complete, the district attorney asked for
compelled statements from the officers, but none of the officers
was asked to waive his right against having the statement used
against him in a proceeding. Id. After the statements were
provided, no charges were brought.
    The court found that the officers' Fifth Amendment rights
were not violated because they were not compelled to answer the
investigator's questions, and later, when the district attorney
compelled the officers to provide written statements, they were
not asked to waive their immunity. Id. at 1166, 1172.

_Aquilera_ court concluded, "[A]s the Supreme Court emphasized in _Gardner_, the Constitution is offended not when an officer is compelled to answer job-related questions, _but only when the officer is required to waive his privilege against self-incrimination while answering legitimate, job-related questions._" (Emphasis added). The _Aquilera_ court also quoted the Fourth Circuit's opinion in _Wiley v. Mayor & City Council of Baltimore_, 48 F.3d 773, 777 (4th Cir. 1995): "[F]orcing a public employee to answer potentially incriminating job-related questions _does not implicate the Fifth Amendment unless the employee is also compelled to waive his privilege._" (Emphasis added in _Aquilera_).

Defendants argue that Enriquez was not compelled to make statements to Summers, because the evidence shows that Enriquez initially agreed to talk to Summers with her attorney present, until her attorney subsequently advised her against meeting with Summers because he thought Summers's mind was made up. Peters dep. 44:21-23; 47:5-16. Enriquez was not compelled to make a statement and did not make one.

Enriquez counters that she was placed in the position of either answering Summers's questions or being fired, and quotes from _Gardner_:

> New York City discharged [plaintiff] for refusal to execute a document purporting to waive his constitutional rights and to permit prosecution of himself on the basis of his compelled testimony. Petitioner could not have assumed--and certainly he was not required to assume-- that he was being asked to do an idle act of no legal

> effect. In any event, the mandate of the great privilege
> against self-incrimination does not tolerate the attempt,
> regardless of its ultimate effectiveness, to coerce a
> waiver of the immunity it confers on penalty of the loss
> of employment.

392 U.S. at 279. Enriquez asserts that Summers demanded a meeting;
showed hostility to Enriquez about hiring a lawyer; and caused
Peters to conclude that Summers's mind was already made up, so that
anything Enriquez told Summers after her arrest would be self
incriminating. Further, she argues, the District terminated her, in
part, for refusing to be interviewed by Summers.

Enriquez's reliance on Garrity is misplaced. As the Court made
clear in Gardner, Garrity was "discharged from office, not for
failure to answer relevant questions about his official duties, but
for refusal to waive a constitutional right. He was dismissed for
failure to relinquish the protections of the privilege against
self-incrimination." 392 U.S. at 278. The cases are unequivocal
that it is not a violation of the right against self-incrimination
to threaten an employee with the loss of her job for refusing to
answer her employer's questions about her conduct on the job. See,
e.g., Gardner, 392 U.S. at 278 (public employees may be discharged
for not answering questions if they are not required to waive
immunity); Cunningham, 431 U.S. at 806 (public employees may
constitutionally be discharged for refusing to answer potentially
incriminating questions if they have not been required to surrender
their constitutional immunity); Aquilera, 510 F.3d at 1171 (public

OPINION AND ORDER Page 13

employer has right to question employee about matters relating to employee's possible conduct while on duty).

As the court pointed out in Aguilera, if an employee were compelled to make incriminating statements, the employee would automatically be entitled to immunity against the use of such statements in a criminal proceeding against him. 510 F.3d at 1172 n. 5, citing Minnesota v. Murphy, 465 U.S. 420, 434 (1984). See also Garrity, 385 U.S. 500 (when a policeman had been compelled to testify by the threat that otherwise he would be removed from office, the testimony that he gave could not be used against him in a subsequent prosecution). The employer violates the employee's rights only when the employee is forced *both* to incriminate herself and waive her immunity from subsequent prosecution. Enriquez was not required to do either one.

The District was not prohibited from threatening or implementing termination for Enriquez's refusal to be interviewed. The District did not require Enriquez to waive her immunity from self-incrimination. Enriquez did not in fact make any self-incriminating statement, so her right to remain silent was not violated. Cf. Garrity, 385 U.S. at 496 ("The question is whether the accused was deprived of his 'free choice to admit, to deny, or to refuse to answer.'").

In Aguilera, the commanding officer made direct threats to the officers that they might lose their jobs if they did not talk;

OPINION AND ORDER Page 14

the court nevertheless held that the threats did not create a genuine issue of material fact on the self-incrimination claim, because the officers were not asked to waive their immunity and no statement was ever used against them. The facts of this case are analogous to those in Aguilera.

I conclude that, as a matter of law, Enriquez cannot establish a violation of her right against self-incrimination by either Taylor[4] or Summers. I recommend that the District's motion for summary judgment on this claim be granted, and that defendants' alternative motions against the punitive damages claim and for qualified immunity be denied as moot.

2.   The § 1983 Claim-Sixth Amendment

The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Defendants assert that because Enriquez had no constitutional right to an attorney during the District's investigation, she cannot establish that she was deprived of her right to counsel.

The right to counsel under the Sixth Amendment means "at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him,

_____

[4]Enriquez has not made out even a colorable self-incrimination claim against Taylor, whose questioning of Enriquez occurred before Enriquez became a suspect, and who had no contact with Enriquez after February 27, 2008. Taylor Declaration ¶¶ 15-16.

whether by formal charge, preliminary hearing, indictment, information or arraignment." <u>Brewer v. Williams</u>, 430 U.S. 387 (1977). Thus, the right does not attach until a prosecution is commenced. <u>Neil v. Wisconsin</u>, 501 U.S. 171, 175 (1991); <u>Cooper v. Dupnik</u>, 924 F.2d 1520, 1526 n. 7 (9th Cir. 1991)(no Sixth Amendment right to counsel during interrogation because no adversarial criminal proceeding had been brought).[5]

Defendants argue that because Enriquez was indicted on April 1, 2008,[6] she had no constitutional right to counsel before that date. They argue that even if there were evidence that Summers refused to meet with Enriquez if her attorney were present, such conduct would not implicate the right to counsel because Enriquez did not have a constitutional right to an attorney at that time.[7]

Enriquez argues that for two days, between the indictment on April 1, 2008 and her termination on April 3, 2008, she had a right

---

[5] The court has doubts about Enriquez's apparent assumption that she had a right to counsel at the interview with Summers, because the only consequence of the interview was termination, not the loss of her liberty. In <u>Lassiter v. Dept. of Soc. Serv. of Durham Co.</u>, 452 U.S. 18, 25 (1981), the Court observed that the "pre-eminent generalization" that emerges from its cases on the right to counsel is that such a right has been recognized "only where the litigant may lose his physical liberty if he loses the litigation." The right to counsel rests upon the defendant's interest in personal freedom, not in continued employment.

[6] Enriquez was indicted on April 1, 2008. Kraemer Declaration, Exhibit C. She was terminated on April 3, 2008.

[7] Peters's testimony shows that as of March 11, 2008, Enriquez had, through Peters, declined to meet with Summers.

to counsel, and that "[t]o threaten Enriquez and fire her for following her lawyer's advice to remain silent to Summers' demands, denies her of [sic] the right to effective counsel, and the opportunity to follow his advice." Enriquez cites no legal authority for this argument, arguing that making it "very hard to decide between what your lawyer says and no job" is "denial of effective counsel," and that "the defendants' demands for answers continued after the indictment was returned."

This argument is unpersuasive. Enriquez had a lawyer before and after she was indicted. The potential loss of one's employment does not trigger a constitutional right to counsel. Consequently, Enriquez's right to the assistance of counsel was not violated.

A claim for violation of the right to effective counsel requires the claimant to establish that her counsel's representation fell below an objective standard of reasonableness. See, e.g., <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984); <u>Harris v. Wood</u>, 64 F.3d 1432, 1435 (9th Cir. 1995). Enriquez has not charged her counsel with being ineffective.

Being faced with adverse consequences as a result of following a lawyer's advice is not a denial of the right to effective counsel. The defendants' motion for summary judgment on this claim is granted.

3.   <u>False arrest</u>

The elements of a false arrest action are 1) plaintiff was

confined, 2) defendant intended to accomplish the act that caused confinement, 3) plaintiff was aware of the confinement, and 4) the confinement was unlawful. Ross v. City of Eugene, 151 Or. App. 656, 663, 950 P.2d 372 (1997). Defendants assert that Enriquez's claim for false arrest fails because the District did not instigate Enriquez's arrest, and even if her arrest could be attributed to the actions of the District, there was probable cause for her arrest.

The question of whether the officers had probable cause to arrest Enriquez, when the facts are not in dispute, is a question of law to be decided by the court. Erlandson v. Pullen, 45 Or. App. 467, 608 P.2d 1169 (1980); see also Peng v. Mei Chin Penghu, 335 F.3d 970, 979-80 (9th Cir. 2003)(when historical facts not in dispute, and only disputes involve inferences to be drawn from those historical facts, appropriate for court to decide whether probable cause existed at time of arrest).

Probable cause exists where "at the moment of arrest the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense." Blankenhorn v. City of Orange, 485 F.3d 463, 471 (9th Cir. 2007)(internal quotations omitted). Oregon uses a similar standard. See Or. Rev. Stat. § 131.005(11)(Probable cause means that there is a

substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it.)

Defendants argue that at the time of Enriquez's arrest, there was sufficient objective evidence to provide the police with probable cause to arrest her: Gilbert Park had an unusual number of add adjust transactions without corresponding subtract adjust transactions, relative to other schools. Employee timesheets at Gilbert Park indicated that Enriquez was at work each time a suspicious transaction occurred, and that no suspicious transactions occurred when Enriquez was not at work for a two week period. Enriquez had access to the computer on which the transactions were done, and was in charge of daily accounting for deposits.

Enriquez does not address this issue in her response, except to assert that evidence of her acquittal is relevant to her claims. It is not. Probable cause to arrest is determined at the time of the arrest itself, not in light of subsequent events. See, e.g., Beck v. Ohio, 379 U.S. 89, 91 (1964)(probable cause exists when police have knowledge *at the moment of arrest* of facts and circumstances based on reasonably trustworthy information that would warrant a belief by a reasonably prudent person that the person arrested has committed a criminal offense); United States v. Henderson, 241 F.3d 638, 648 (9th Cir. 2000)[Officers have probable

cause for an arrest *if at the time of the arrest*, the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent man in believing that the defendant committed an offense, citing <u>Hunter v. Bryant</u>, 502 U.S. 2243, 228 (1991)]. (Emphasis added).  I find that the undisputed facts establish probable cause for Enriquez's arrest.

The motion for summary judgment on the false arrest claim is granted, because the existence of probable cause at the time of the arrest defeats the claim.

     4.  <u>Common law wrongful discharge</u>

Defendants contend that they are entitled to summary judgment on the wrongful discharge claim because 1) the CBA provides an adequate remedy through the grievance process, to the extent Enriquez is alleging that the District terminated her because she wanted her attorney present to meet with Summers; 2) if the court determines that Summers and Taylor are not entitled to qualified immunity, then Enriquez's § 1983 claim provides her an adequate remedy; and 3) Enriquez's purported exercise of her constitutional rights did not violate any legal rights related to her employment, because they exist independent of the employment relationship.

Defendants assert that by virtue of her employment, the terms of the CBA between the District and the Oregon School Employees Association Chapter 40 collective bargaining unit apply to

Enriquez. Stout Declaration ¶ 3, Exhibit A. Plaintiff has testified that she was not aware she was a member of the union.

Enriquez's status as a member of the union does not preclude her from pursuing a wrongful discharge claim. Shockey v. City of Portland, 313 Or. 414, 837 P.2d 505 (1992)(en banc). A determination of whether a CBA's grievance procedure preempts a wrongful discharge claim is made through a "case-by-case analysis of whether resolution of the claim depends upon interpretation of the bargaining agreement." Coulter v. Construction and General Laborers Union Local 320, 107 Or. App. 522, 527, 812 P.2d 850 (1991).

The defendants rely on a provision of the CBA stating that "[w]hen the District determines that the job performance or conduct of an employee is such that dismissal is necessary, the employee *may elect* to be given a pretermination hearing before the District Superintendent or designee." Stout Declaration ¶ 3, Exhibit A, Article 17. (Emphasis added) If the District fails to follow this procedure, the employee can follow the grievance procedure of the CBA. There is no evidence that Enriquez requested a pre-termination hearing.

Defendants argue that "the District's supposed failure to meet with [Enriquez] is an allegation that the District refused to provide her a hearing regarding her termination." Defendants' Memorandum p. 25. Defendants admit, however, that "technically,"

Enriquez did not ask for a pre-termination hearing or bring a claim for the District's failure to provide one.

I do not find persuasive the defendants' attempt to characterize Enriquez's constitutional claims as a claim that the District refused to provide her a pre-termination hearing that she didn't ask for, and then assert that the CBA governs pre-termination hearings. Enriquez has asserted claims that she was terminated for pursuing her rights against self-incrimination and effective counsel, not that the District failed to provide her with a pre-termination hearing.

Despite Enriquez's concession that her § 1983 claims provide an adequate alternative remedy to the wrongful discharge claim, in terms of the damages recoverable under both claims, see Plaintiff's Memorandum p. 12, I am not persuaded that they do. To impose liability on the District under theories of § 1983, Enriquez is required to show 1) that she possessed a constitutional right of which she was deprived; 2) that the District had a policy, custom or practice; 3) that this policy amounted to deliberate indifference to the plaintiff's constitutional right; and 4) that the policy was the moving force behind the constitutional violation. Plumeau v. Sch. Dist. No. 40 Co. of Yamhill, 130 F.3d 432, (9th Cir. 1997)(internal quotations and citations omitted). First, the § 1983 claims are not alleged against the District, but against Summers and Taylor. Further, Enriquez does not allege a

wrongful discharge claim against Summers or Taylor, nor could she. Enriquez's allegations in her § 1983 claims against District employees are not something the employer District can be liable for under respondeat superior. Enriquez has made no allegation that the District had a policy amounting to deliberate indifference to Enriquez's rights. The adequacy of Enriquez's § 1983 remedy against the *employees* does not preclude a wrongful discharge claim against the *employer District,* because Enriquez's § 1983 allegations are not made against the District.  Therefore, I do not believe § 1983 offers Enriquez an adequate alternative to a claim for wrongful discharge against the District. See Draper v. Astoria Sch. Dist. No. IC, 995 F. Supp. 1122, 1128 (D. Or. 1998), *abrogated in part on other grounds,* Rabkin v. Oregon Health Sciences Univ., 350 F.3d 967 (9th Cir. 2003)(wrongful termination an "interstitial" tort to "provide a remedy when the conduct in question was unacceptable and no other remedy was available.)

Defendants also argue that Enriquez's constitutional claims are independent of the employment relationship, citing Downs v. Waremart, Inc., 137 Or. App. 119, 126, 903 P.2d 888 (1996)("the right to counsel is not uniquely related to the employment relationship. It is a right that exists independently of a person's status as an employee") and Garrity, 385 U.S. at 496-97 (primary purpose of the right against self-incrimination is to prohibit the use of compelled testimony against the accused in a criminal

proceeding). I am not persuaded that this argument provides a basis for awarding summary judgment to the District on the wrongful discharge claim, because a claim for wrongful discharge does not always require exercise of an employment-related right. See, e.g., Nees v. Hocks, 272 Or. 210, 218, 536 P.2d 512, 516 (1975)("We conclude that there can be circumstances in which an employer discharges an employee for such a socially undesirable motive that the employer must respond in damages for any injury done.") and Delaney v. Taco Time Intern., 297 Or. 10, 16, 681 P.2d 114, 118 (1984)(plaintiff fired for refusing to sign a false and arguably tortious statement).

The District's motion for summary judgment in its favor on Enriquez's wrongful discharge claim is denied.

5.   <u>Wage claims</u>

For this claim, Enriquez alleges that she is owed wages for two days, September 17, 2007 and November 2, 2007, because the District altered her timesheets for those days; that the district did not pay her wages for the last two days she worked; that the District did not reimburse her upon termination for health insurance premiums she had paid in advance for the summer months; and that the District failed to provide Enriquez with a lunch break or compensatory time off in the two years prior to her termination. Enriquez states in her brief that she has been paid all the wages owed to her by the District, leaving only the possibility of

statutory penalties.

Defendants assert that the unpaid wage claims are barred by Enriquez's failure to provide timely tort claims notice pursuant to Or. Rev. Stat. § 30.275(1)(the Act). The District received a Tort Claim Notice on September 23, 2008, 173 days after Enriquez's termination. Stout Declaration ¶ 17. The statutory deadline is 180 days after the alleged loss or injury.

Enriquez counters that the Act has no application to this case because Enriquez's wage claims sound in contract, or quasi-contract, not tort. Defendants counter that the claims arise pursuant to a liability created by statute, Or. Rev. Stat. § 653.055(1), and are therefore subject to the Act.

The Act, Or. Rev. Stat. § 30.275, provides as follows:

> (1) No action arising from any act or omission of a public body or an officer, employee or agent of a public body within the scope of ORS 30.260 to 30.300 [the statutes waiving sovereign immunity] shall be maintained unless notice of claim is given as required by this section.

For purposes of this statute, "tort" is defined as follows:

> "Tort" means the breach of a legal duty that is imposed by law, other than a duty arising from contract or quasi-contract, the breach of which results in injury to a specific person or persons for which the law provides a civil right of action for damages or for a protective remedy.

Or. Rev. Stat. § 30.260(8). Defendants argue that Enriquez's claim for wage penalties arises from a duty imposed by statute, not from contract or quasi-contract, so it is governed by the Act. However,

OPINION AND ORDER Page 25

the parties acknowledged at oral argument that there was no case law governing a situation in which a penalty wage claim depends on an underlying contract of employment.

The statutory definition of "tort" leads me to the conclusion that § 30.275 applies to tort claims and to claims that are purely statutory, but not to statutory penalty claims whose genesis is a wage claim arising out of contract, as is the case here. Without the contractual right to wages, there would be no statutory penalty claim. Accordingly, I conclude that because Enriquez's claim for statutory penalties is based on the District's alleged failure to pay wages pursuant to her employment contract, the tort claims notice requirement is inapplicable and her claim is not time-barred.

6.   Alternative motions to strike punitive damages and for qualified immunity

The defendants' alternative motions to strike the request for punitive damages under Enriquez's § 1983 claim against Summers and Taylor, and for qualified immunity, are denied as moot, in view of my ruling that the defendants are entitled to summary judgment on the § 1983 claims.

7.   Evidentiary objections

Enriquez has objected to some parts of defendants' Concise Statement of Fact. The disputes arise from 1) whether Enriquez was a member of the union or not (she did not pay dues and did not consider herself a member of the union, but was in the collective

OPINION AND ORDER Page 26

bargaining unit), CSF ¶ 3; 2) how much money was stolen from the MealTime account, CSF ¶ 6; and 3) whether notes written by Peters and Summers are hearsay, CSF ¶ 23. Defendants object to Exhibit 5 of the Declaration of Mark Morell. The court did not rely on any of this evidence in reaching its conclusions. Accordingly, the objections are overruled.

IT IS SO ORDERED.


Dated this 27th day of October, 2010.


_/s/_____
        Dennis James Hubel
United States Magistrate Judge